

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
12/29/2018

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 18-35672 |
| WESTMORELAND COAL COMPANY, *et al.*, | § | CHAPTER 11 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | DAVID R. JONES |
| | § | |
| TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | ADVERSARY NO. 18-3300 |
| | § | |
| WESTMORELAND COAL COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION
**(Docket Nos. 22 and 25)**

    Before the Court is the question of whether the Debtors' obligations under the Coal Industry Retiree Health Benefits Act of 1992 (the "Coal Act") are subject to the provisions of 11 U.S.C. § 1114. As set forth below, the Court answers the question[1] in the affirmative. Accordingly, the Court will grant the Debtor-Defendants' Motion for Judgment on the Pleadings [Docket No. 22] and deny the Plan Trustees' Cross-Motion for Judgment on the Pleadings under Rules 12(c) and 56 [Docket No. 25]. A separate judgment will issue consistent with this memorandum opinion.

---

[1] For purposes of clarity, this memorandum opinion is limited solely to the question of whether 11 U.S.C. § 1114 applies to the Debtors' obligations under the Coal Act. Nothing herein is intended to express an opinion about whether the Debtors are entitled to relief under § 1114.

**Relevant Procedural History**

1. On October 9, 2018, Westmoreland Coal Company and 36 affiliates[2] filed voluntary petitions under chapter 11 of the Bankruptcy Code. By Order entered the same day, the Court approved the joint administration of the cases pursuant to FED. R. BANKR. P. 1015(b) and LOC. R. BANKR. P. 1015-1 [Docket No. 71, Case No. 18-35672].

2. On October 23, 2018, Michael H. Holland, Michael O. McKown, Joseph R. Reschini, Marty D. Hudson, William P. Hobgood, Carl E. Van Horn, and Gail R. Wilensky, as trustees of the United Mine Workers of America Combined Benefit Fund and Michael H. Holland, Michael O. McKown, Joseph R. Reschini, and Carlo Tarley as trustees of the United Mine Workers of America 1992 Benefit Plan (collectively, the "Plan Trustees") filed their complaint in this adversary proceeding against the Debtors seeking a declaratory judgment that the Debtors' obligations under the Coal Act are not "retiree benefits" subject to 11 U.S.C. § 1114 [Docket No. 1]. In addition, the Plan Trustees seek an award of attorney's fees and costs under 29 U.S.C. § 1132(g)(2) [Docket No. 1].

3. On November 12, 2018, the Debtors filed their Motion for Judgment on the Pleadings on the Coal Act Funds' Complaint for Declaratory Relief pursuant to Federal Rule of Civil Procedure 12(c) [Docket No. 22]. In the motion, the Debtors request (i) a finding that § 1114 is applicable to their obligations under the Coal Act; and (ii) the dismissal of this adversary proceeding [Docket No. 22].

4. The Plan Trustees filed their response on November 27, 2018 [Docket No. 25]. Included in the response is a cross-motion for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c) and 56 [Docket No. 25].

5. The Court conducted a hearing on the motions on November 29, 2018. After hearing arguments, the Court requested that the parties jointly submit the briefs filed before the Eleventh Circuit in a pending appeal on the identical issue involving Walter Energy, Inc.[3] The joint submission of the parties is filed at Docket No. 47. In addition, and in recognition of the

---

[2] The Debtors include Westmoreland Coal Company, Absaloka Coal, LLC, Buckingham Coal Company, LLC, Dakota Westmoreland Corporation, Daron Coal Company, Harrison Resources, LLC, Haystack Coal Company, Oxford Conesville, LLC, Oxford Mining Company – Kentucky, LLC, Oxford Mining Company, San Juan Coal Company, San Juan Transportation Company, Texas Westmoreland Coal Company, WCC Land Holding Company, Inc., WEI – Roanoke Valley, Inc., Western Energy Company, Westmoreland Coal Company Asset Corp., Westmoreland Coal Sales Company, Inc., Westmoreland Energy Services New York, Inc., Westmoreland Energy Services, Inc., Westmoreland Energy, LLC, Westmoreland Kemmerer Fee Coal Holdings, LLC, Westmoreland Kemmerer, LLC, Westmoreland Mining, LLC, Westmoreland North Carolina Power, LLC, Westmoreland Partners, Westmoreland Power, Inc., Westmoreland Resource Partners, LP, Westmoreland Resources, GP, LLC, Westmoreland Resources, Inc., Westmoreland San Juan Holdings, Inc., Westmoreland San Juan, LLC, Westmoreland Texas Jewett Coal Company, Westmoreland – Roanoke Valley, LP, WRI Partners, Inc. and Basin Resources, Inc.

[3] After the conclusion of the November 29, 2018 hearing, the Eleventh Circuit issued its opinion finding that Walter Energy's obligations under the Coal Act are subject to § 1114. *See UMWA Combined Benefit Fund, et al v. Andre M. Toffel, as Chapter 7 Trustee for Walter Energy, Inc., et al.*, 2018 WL 6803736 (11th Cir. 2018).

importance of the issue presented, the Court, *sua sponte*, raised the issue of a direct appeal of this ruling to the Fifth Circuit Court of Appeals. By joint notice filed at Docket No. 49, the parties indicated a preference that the Court certify its ruling for direct appeal pursuant to 28 U.S.C. 158(d)(2).

## Jurisdiction and Authority

6. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a). This proceeding is a core proceeding arising under title 11 pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). The Court has constitutional authority to enter a final judgment in this proceeding under the Supreme Court's holding in *Stern v. Marshall*, 131 S.Ct. 2594 (2011). No party asserts that the Court lacks the requisite jurisdiction or authority to issue a final judgment.

## Legal Standard

7. Rule 12(c) of the Federal Rules of Civil Procedure, as made applicable in this adversary proceeding by FED. R. BANKR. P. 7012(b), provides that "[a]fter pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "A motion brought pursuant to FED. R. CIV. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (*citing Herbert Abstract Co., v. Touchstone Props., Ltd.*, 914 F.2d 74,76 (5th Cir. 1990)). In deciding a motion under Rule 12(c), the Court "must look only to the pleadings and accept all allegations contained therein as true. Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain." *Brittan Communications Intern. Corp. v. Southwestern Bell Tel. Co.*, 313 F.3d. 899, 904 (5th Cir. 2002) (citations omitted). In addition to the pleadings, the Court "may take into account documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Myeres v. Trexton, Inc.*, 540 FED. APPX. 408, 409 (5th Cir. 2013) (citations omitted).

8. When presented with a motion under Rule 12(c), the parties may offer matters outside the pleadings. FED. R. CIV. P. 12(d). If these matters are not excluded, the Court is required to treat the motion as a motion for summary judgment under Rule 56. *Id*. Under these circumstances, the Court is required to give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. The Court declines to treat the parties' competing Rule 12(c) motions as motions under FED. R. CIV. P. 56. The Court has limited its analysis to the pleadings and other permitted matters in accordance with the standard defined by the Fifth Circuit.

## The Coal Act

9. The Coal Act was the byproduct of a "a lengthy strike that followed Pittson Coal Company's refusal to sign the 1988 NBCWA[4]." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 511 (1998). The strike led to the creation of the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission"). *Id.* The Coal Commission was charged with making a recommendation regarding medical benefits for retirees that were originally covered under benefit trusts which preceded the Coal Act. *Id.*

10. After legislation incorporating the Coal Commission's recommendations was vetoed by President Bush, Congress passed the Coal Act. *Id.* at 513. (citations omitted). As the Supreme Court explained:

> The Coal Act merged the 1950 and 1974 Benefit Plans into a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund (Combined Fund). See 26 U.S.C. §§ 9702(a)(1), (2). The Combined Fund provides 'substantially the same' health benefits to retirees and their dependents that they were receiving under the 1950 and 1974 Benefit Plans. *See* §§ 9703(b)(1), (f). It is financed by annual premiums assessed against 'signatory coal operators,' *i.e.*, coal operators that signed any NBCWA or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans. *See* §§ 9701(b)(1), (3); 9701(c)(1). Any signatory operator who 'conducts or derives revenue from any business activity, whether or not in the coal industry,' may be liable for those premiums. §§ 9706(a), 9701(c)(7). Where a signatory is no longer involved in any business activity, premiums may be levied against 'related person[s],' including successors in interest and businesses or corporations under common control. §§ 9706(a), 9701(c)(2)(A).

*Id.* at 514. The stated purpose of the Coal Act was "to identify persons most responsible for [1950 and 1974 Benefit Plan] liabilities in order to stabilize plan funding and allow for the provision of health care benefits to … retirees." *Id*. (citations omitted).

## Section 1114 of the Bankruptcy Code

11. In 1988 Congress passed the Retiree Benefits Bankruptcy Protection Act of 1988 (the "Retiree Benefits Act") which added § 1114 to the Bankruptcy Code. *See generally,* 7 COLLIER ON BANKRUPTCY ¶ 1114.01 [1], at 1114-7 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). The Retiree Benefits Act was a legislative reaction to a growing number of bankruptcy cases that drew a distinction between collective bargaining agreements covered by § 1113 of the Bankruptcy Code and "retiree benefits" which resulted in the unilateral rejection those retiree benefits. 7 COLLIER ON BANKRUPTCY ¶ 1114.10[2][a], [b], at 1114-39-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see also In re Certified Air Technologies, Inc.*, 300 B.R. 355, 370 (Bankr. C.D. Ca. 2003). The most often cited example as the impetus for § 1114 was the

---

[4] The National Bituminous Coal Wage Agreement.

suspension of medical benefits to approximately 78,000 former employees by LTV Corporation after filing bankruptcy.[5]

12. Section 1114 was meant to be a protective mechanism for retiree benefits when an employer enters bankruptcy. Specifically, § 1114 provides an organized framework for the negotiation of retiree benefits between a debtor-employer and an authorized representative of the retirees. *See* 11 U.S.C. § 1114(f). If the debtor makes a proposal in accordance with § 1114(f) and that proposal is not accepted without good cause, the Court *shall* enter an order that provides for the *modification* of retiree benefits under certain *limited* circumstances. 11 U.S.C. § 1114(g) (emphasis added).

13. As previously mentioned, the sole issue before the Court is whether the Debtors' Coal Act obligations are "retiree benefits" subject to § 1114. The issues of whether (i) the Debtors can satisfy their obligations under § 1114(f); and (ii) modification of "retiree benefits" is appropriate are left for another day.

### Rules of Statutory Construction

14. Where Congress has not expressly limited the applicability of one statute within the context of another, the Court must apply the rules of statutory construction to determine the interaction of two statutes. "[C]ourts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

15. "In determining the scope of a statute, a court must begin with the statutory language itself. When the terms of the statute are clear, the statutory language is controlling, absent exceptional circumstances." *In re Westmoreland Coal Co.*, 213 B.R. 1, 18 (1997); *see also Fidelity Savings & Inv. Co. v. New Hope Baptist*, 880 F.2d. 1172, 1175 (10th Cir. 1989). Moreover, "[i]t is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (citing *Morton v. Mancari*, 417 U.S. 535, 550-551 (1974)).

16. Section 1114 of the Bankruptcy Code was enacted in 1988 and the Coal Act in 1992. The Coal Act generally covers the health and death benefits that must be provided to retired mine workers and their beneficiaries. Section 1114 deals with the limited instance where the retirees' former employer is a debtor in a chapter 11 bankruptcy and a modification of benefits is necessary to effect a reorganization. The Court finds that the Coal Act is the more general statute, and § 1114 of the Bankruptcy Code is the more specific. The application of § 1114 does not deprive the Coal Act of any meaning nor do the two statutes conflict. If Congress had desired to impose a different scheme or limit the Court's authority to modify retiree benefits under the Coal Act, it could have easily done so. *See In re Horizon Nat.*

---

[5] *In re LTV Corp.*, No. 86 B 11402 (Bankr. S.D.N.Y. July 17, 1986).

*Resources Co.,* 316 B.R. 268, 279 (Bankr. E.D. Ky. 2004); *In re Lady H Coal Co.*, 199 B.R. 595, 603 (S.D. Va. 1996).

### Analysis

17. The parties do not dispute the relevant facts. The Debtors are subject to the Coal Act. Under the Coal Act, the Debtors are obligated to pay premiums into (i) United Mine Workers of America Combined Benefit Fund (the "Combined Fund") and (ii) the United Mine Workers of America 1992 Benefit Plan (the "1992 Plan") based on the number of existing retirees assigned to them as signatory operators under each of the plans. The Debtors are further obligated to post security in favor of the 1992 Plan in an amount equal to one year of premiums based on a historical three-year average. Finally, the Debtors are required to maintain an Individual Employer Plan (the "IEP") for certain retirees. Accepting these facts as true, the Plan Trustees make a series of legal arguments that Coal Act obligations are excluded from the operation of § 1114. The Court will address each of the arguments below.

*Whether § 1114 Applies to Statutorily Created Benefits.*

18. Under the Coal Act, coal operators are required to provide certain benefits to their retirees. First, operators must pay premiums into the Combined Fund and the 1992 Plan based on the number of operator-assigned beneficiaries enrolled in each of these plans. 26 U.S.C. §§ 9704(a); 9712(d)(1)(A). Second, operators must continue to provide benefits to certain retirees under an individual employer plan ("IEP") so long as the operator remains in business. 26 U.S.C. § 9711(a). Finally, operators must post security in the form of a bond, letter of credit, or cash escrow, in favor of the trustees of the 1992 Plan, in an amount equal to one year of premium liability based on a historical three-year average. 26 U.S.C. § 9711(c)(3). The Plan Trustees assert that § 1114 does not apply to these obligations because they are statutorily mandated.

19. Section 1114(a) states that:

> [f]or purposes of this section, the term "retiree benefits" means *payments to any entity* or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death *under any plan, fund, or program* (through the purchase of insurance or otherwise) *maintained or established in whole or in part* by the debtor prior to filing a petition commencing a case under this title."

11 U.S.C. § 1114(a) (emphasis added). To reach their conclusion, the Plan Trustees must necessarily insert a limitation on "retiree benefits" to restrict application of the statute to "contractual retiree benefits." Neither the parties nor the Court may intrude on this legislative function. In *In re Horizon Nat. Resources Co.*, the Court noted that "the statutory definition makes no distinction between contractual and non-contractual benefits" and that "benefits provided pursuant to the Coal Act constitute 'retiree benefits' within the meaning of § 1114 of the Bankruptcy Code." 316 B.R. 268, 275-76 (Bankr. E.D. Ky. 2004). The Court finds this analysis persuasive and consistent with the applicable rules of statutory construction.

20. The text of § 1114 is unambiguous. The definition of "retiree benefits" contains no limitation to suggest that Congress intended for contractual benefits to be treated any differently than statutorily created ones. To the contrary, the express language of § 1114 contemplates benefits emanating from multiple origins. *See* 11 U.S.C. § 1114(b)(1). The Court finds that the Debtors' Coal Act obligations are "retiree benefits" under § 1114.

*Whether the Debtors' Payment of Premiums Constitutes "Maintenance in Part."*

21. The Plan Trustees next assert that neither the Combined Fund nor the 1992 Plan are plans "maintained or established in whole or in part" by the Debtors. While acknowledging that, with one exception, all current precedent has overruled this argument, the Plan Trustees assert that each of these decisions inappropriately relied upon prior wrongfully-decided decisions. For this Court, the ultimate question is whether the payment of premiums to a benefit program constitutes an act to maintain that program in part?

22. Neither the term "maintenance" nor the phrase "maintenance in part" are defined under the Bankruptcy Code. Likewise, the Court has not been directed to, nor has it been able to locate, any legislative history evidencing Congressional intent to give special meaning to these words. "The Fifth Circuit has instructed that "[f]inding no statutory definition and nothing in the entire statutory scheme or legislative history to indicate a contrary intent, we abide by the canon that words in a statute are to be given their 'ordinary, everyday' meaning." *In re DP Partners, Ltd. Partnership*, 106 F.3d 667, 673 (5th Cir.1997) (*citing Crane v. Commissioner*, 331 U.S. 1, 6 (1947)).

23. Black's Law Dictionary defines the verb "maintain" as ". . . other acts to prevent a decline, lapse or cessation from existing state or condition; bear the expense of; carry on; commence; continue; furnish means for subsistence or existence of . . . ." *Maintain*, BLACK'S LAW DICTIONARY (6th ed.1990). MERRIAM-WEBSTER DICTIONARY defines "maintain" as "to keep in an existing state; preserve from failure or decline; to support or provide for; to sustain." *Merriam-Webster Dictionary*, (December 14, 2018, 2:29 P.M.), https://www.merriam-webster.com/dictionary/maintain. Indeed, the Plan Trustees' entire premise in this adversary is to compel the Debtors or their successor to continue to pay the required premiums so that retirees will continue to receive their benefits. From a practical perspective, to suggest that the Debtors' payment of premiums under the Coal Act does not operate to at least partially maintain the underlying benefit programs is to suggest that a table can stand without its legs. The Court finds equally persuasive the learned opinions of those courts that have previously addressed the issue. *In re Walter Energy, Inc.*, 542 B.R. 859 (Bankr. N.D. Ala. 2015), *aff'd*, *UMWA 1974 Pension Plan v. Walter Energy, Inc.*, 579 B.R. 603 (N.D. Ala. 2016), *aff'd*, *UMWA Combined Benefit Fund, et al v. Andre M. Toffel, as Chapter 7 Trustee for Walter Energy, Inc.*, 2018 WL 6803736 (11th Cir. 2018); *In re Horizon Natural Resources Co.*, 316 B.R. 268 (Bankr. E.D. Ky. 2004).

24. In an analogous situation, the United States District Court for the Southern District of New York opined on whether certain school district benefit plans were "established" and "maintained" by the town or school district. *Feinstein v. Lewis*, 477 F. Supp. 1256, 1260 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 573 (2d Cir. 1980). In that situation, the District Court held

that "[a]lthough the Plans are jointly administered by the Union and the employers through the board of trustees, they are *exclusively funded and hence 'maintained' by the employers*." *Id*. (emphasis added).

25. The Court has considered the decision issued in *Buckner v. Westmoreland Coal Co. (In re Westmoreland Coal Co.)*. 213 B.R. 1 (Bankr. D. Co. 1997). In that case, the Court specifically noted that it was not presented with the issue of whether § 1114 applied to Coal Act obligations; rather, the issue was limited to whether an asserted claim under § 1114(e)(2) was entitled to administrative priority. *Id.* at 17-18. In its analysis, the Court stated that "I find nothing in the legislative history indicating that Congress intended § 1114 to apply to statutorily-imposed obligations or to benefits paid by an insurer following prepetition termination of a debtor's self-funded plan." *Id.* at 19. The *Buckner* court's statement was dicta and its analysis was not in accord with accepted cannons of statutory construction. To the extent applicable to the instant situation, the Court rejects the reasoning of the *Buckner* court.

26. For the foregoing reasons, the Court finds that the payment of premiums and other value by the Debtors constitute maintenance in part of the Combined Fund and the 1992 Plan. The Plan Trustees' arguments to the contrary are rejected.

27. The Plan Trustees concede that the IEP is "maintained" by the Debtors but argue that this obligation should nonetheless be excluded from the definition of "retiree benefits" under § 1114(a). The Plan Trustee assert that although the IEP fits within the plain meaning of § 1114(a), it is absurd to think that private parties can negotiate a statutory obligation. This argument ignores the obvious. Section 1114 is a federal statute that authorizes the negotiation process. Moreover, this argument is premature. The only question before the Court is whether the Debtors' Coal Act obligations fall within § 1114(a). The Court rejects the Plan Trustees' absurdity argument.

*Whether the Posting of a Bond is a Form of Payment*

28. As an argument in the alternative, the Plan Trustees assert that the posting of a bond in favor of the 1992 Plan does not constitute "payment" and is therefore excluded from § 1114. As an initial matter, the Plan Trustees offer no basis that would suggest that a coal operator's obligations under the Coal Act are severable. Second, the bond is for a year's worth of benefit premiums and are subject to the same analysis as the premiums themselves. Third, a simple commercial analysis yields a consistent answer. A bond is nothing more than a simple contract. It binds the obligor to pay a sum certain upon the occurrence of an event. *See generally*, 12 AM. JUR. 2d. Bonds § 1. That obligation to pay is no different that the annual obligation to pay the calculated premium. The Court finds that the posting of security, in the form of a bond in favor of the 1992 Plan is a form of payment within the meaning of § 1114(a).

*Futility of IEP Modification*

29. The Plan Trustees argue that if the IEP is found to be a "retiree benefit" under § 1114(a), it would yield a futile result within the statutory schemes. The argument is a house of cards that cannot stand. The argument goes as follows:

  (i)  If the Court allows the modification of the IEP under § 1114(g), it would result in an increase of premiums due under the 1992 Plan in a proportional amount.

  (ii)  Since the premiums due under the 1992 Plan are taxes and not subject to § 1114(a), the Debtors would be liable for those premiums under the 1992 Plan.

  (iii)  The application would yield a futile result.

First, the Court is not deciding whether any modification is appropriate. Second, paragraph (ii) assumes a legal status unsupported by applicable law. Third, paragraph (iii) is a conclusion unsupported by any legitimate argument or statutory language. This argument is not well-received and is rejected.

*Whether Coal Act Premiums are Federal Taxes Subject to the Anti-Injunction Act*

  30.  The Plan Trustees' final argument is that the benefit premiums due under the Coal Act are federal taxes subject to the Anti-Injunction Act. In support of their position, the Plan Trustees cite to a string of decisions issued between 1995 and 1998. *See In re Chateaugay Corp.*, 53 F.3d 478 (2nd Cir. 1995); *Adventure Resources, Inc. v. Holland*, 137 F.3d 786 (4th Cir. 1998); *In re Sunnyside Coal Co.*, 146 F.3d 1273 (10th Cir. 1998); *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124 (4th Cir. 1996); *Lindsey Coal Min. Co. v. Chater*, 90 F.3d 688 (3rd Cir. 1996); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996).

  31.  The Plan Trustees' reliance on these decisions is problematic for several reasons. First, although the *Chateaugay* decision is a foundation for the subsequent cases, it concerned the allowance of a claim in a bankruptcy case filed in 1986—a date prior to the enactment of both § 1114[6] and the Coal Act. *See In re Chateaugay Corp.*, 53 F.3d 478 (2nd Cir. 1995). Second, these decisions all predate the Supreme Court's decision in *National Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*")—a controlling decision that directly addresses the application of the Anti-Injunction Act to another federal statute. Finally, none of the post-*Chateaugay* decisions concern the application of § 1114 in a chapter 11 bankruptcy proceeding.

  32.  The Anti-Injunction Act ("AIA") states that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against who, such tax was assessed." 26 U.S.C. § 7421(a). The Supreme Court has found "the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible…" *Bob Jones University v. Simon*, 416 U.S. 725, 736 (1974). "The statute applies to 'any tax' and precludes attempts to impede the raising of revenues to fund governmental and government-sponsored endeavors." *UMWA Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 637-38 (N.D. Ala. 2016) (citing *Alexander v. Ams. United Inc.*, 416 U.S. 752, 760 (1974)).

  33.  In *NFIB*, the Supreme Court addressed the characterization of the Affordable Care Act's ("ACA") individual mandate. Specifically, the Supreme Court was asked to decide

---

[6] Section 1114 was applicable to bankruptcy cases commenced after June 16, 1988.

whether the individual mandate was "tax" and thus subject to the Anti-Injunction Act ("AIA") or a "penalty." *NFIB* at 543. The Supreme Court opined that "[t]he Anti-Injunction Act applies to suits 'for the purpose of restraining the assessment or collection of any *tax*.'" *Id*. Citing 26 U.S.C. § 7421(a) (emphasis in original). It concluded that "Congress, however, chose to describe the '[s]hared responsibility payment' imposed on those who forgo health insurance not as a 'tax,' but as a 'penalty.' There is no immediate reason to think that a statute applying to 'any tax' would apply to a 'penalty.'" *Id*. (citations omitted). "Congress's decision to label this exaction a 'penalty' rather than a 'tax' is significant because the Affordable Care Act describes many other exactions it creates as 'taxes.' Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Id.* at 544. (citations omitted).

34. In *Walter Energy*, the District Court applied this logic to Coal Act obligations. In upholding a sale of the Debtor's assets free and clear of future Coal Act obligations, the District Court found that Congress's choice of the term "premiums" versus "tax" was fatal to the assertion that the Anti-Injunction Act applied. *UMWA Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631 (S.D. Ala. 2016). The Court further notes that the Coal Act is embodied within Title 26, otherwise known as the Internal Revenue Code. While at first blush, this fact might lend support to the Plan Trustees' argument, a careful analysis leads to the opposite conclusion. Under Title 26, the, the first five subtitles are titled "Income *Taxes*; Estate and Gift *Taxes*; Employment *Taxes*; Miscellaneous Excise *Taxes*; and Alcohol, Tobacco, and Certain Other Excise *Taxes*." *See*, 26 U.S.C. Subt. A-E. (emphasis added). The Coal Act is Subtitle J which is titled "Coal Industry Health Benefits." 26 U.S.C. Subt. J.

35. The word "tax" does not appear within the heading of Subtitle J. Interestingly, the word "tax" does appear elsewhere in Subtitle J. It appears in § 9702 to describe the tax treatment of Combined Fund as a tax-exempt organization. 26 U.S.C. § 9702(a)(4). It appears in § 9705 to describe the treatment of the transfer of funds from the prior benefit plans to the newly created Combined Fund. 26 U.S.C. § 9705 (a)(4)-(5). Finally, it appears in § 9707 to describe the treatment of penalties imposed by that section. 26 U.S.C. § 9707(f). It is undeniable that Congress understood how to call something a tax when they meant for that thing to be a tax within Title 26. Under the dictate of *NFIB*, the Court must therefore presume that Congress acted intentionally in labeling Coal Act obligations as "premiums." The Court therefore finds that the Debtors' obligations under the Coal Act are not taxes subject to the Anti-Injunction Act.

### Direct Certification to the Fifth Circuit Court of Appeals

36. In response to the Court's inquiry, the parties filed a joint notice at Docket No. 49 requesting the Court to certify this decision to the Fifth Circuit Court of Appeals, regardless of the outcome. The Court finds that this decision involves a matter of public importance and that no controlling decision has been issued by the Fifth Circuit Court of Appeal or the United States Supreme Court. The Court further finds that the resolution of this adversary proceeding will materially advance the underlying bankruptcy case—a case whose outcome affects thousands of citizens and has a material impact on the national economy. The Court certifies this judgment for direct appeal to the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii).

## Conclusion

37. For the reasons set forth above, the Court concludes that Debtors' obligations under the Coal Act are subject to Section 1114 of the Bankruptcy Code. The Court will grant the Debtors' Motion for Relief under Rule 12(c). The Court denies the Plan Trustees' Motion for Relief under Rule 12(c) and Rule 56. A judgment consistent with this opinion will issue separately. The Court further certifies its judgment for direct appeal to the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. §§ 158(d)(2)(A)(i) and (iii).

**SIGNED: December 28, 2018.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**